FILED

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DREIER STEIN KAHAN
    BROWNE WOODS GEORGE LLP
Stanton L. Stein (No. 131567)
lstein@dreierstein.com
Fred Griffin (No. 66027)
fgriffin@dreierstein.com
Brooke H Eisenhart (No. 229299)
beisenhart@dreierstein.com
The Water Garden
1620 26th Street
6th Floor, North Tower
Santa Monica, CA 90404
Telephone: 310.828.9050
Facsimile:  310.828.9101

Attorneys for Plaintiff
Wilshire Associates Incorporated

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

2008 MAY -7  PM 3: 47

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

MMM

(CWx)

DREIER STEIN KAHAN
BROWNE WOODS GEORGE LLP

| | |
|---|---|
| Wilshire Associates Incorporated, a California Corporation,<br><br>        Plaintiff,<br><br>  vs.<br><br>Ashland Partners & Co., LLP, an Oregon Limited Liability Partnership,<br><br>        Defendant. | CASE NO. CV08-03008<br><br>**COMPLAINT FOR DECLARATORY RELIEF** |

COMPLAINT

Plaintiff Wilshire Associates Incorporated ("Wilshire") for its complaint against defendant Ashland Partners & Co., LLP ("Ashland") alleges as follows:

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that the plaintiff and defendant are citizens of different states, and that the matter in controversy exceeds the sum or value of seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

2.     Venue is proper in this Court because the parties have expressly submitted to venue in this judicial district pursuant to a forum selection clause contained in the written agreement that is the subject of this action.  In addition, venue is proper in this Court because Wilshire is a resident of this district pursuant to 28 U.S.C. § 1391(c).

## THE PARTIES

3.     At all times mentioned herein, Wilshire was and is a California corporation organized and existing under the laws of the State of California, with its principal place of business in Santa Monica, California.

4.     Wilshire is informed and believes that at all times mentioned herein, defendant Ashland was and is an Oregon Limited Liability Partnership organized and existing under the laws of the State of Oregon, with its principal place of business in Central Point, Oregon.

## GENERAL ALLEGATIONS

### A.     The Parties' Businesses

5.     Wilshire and Ashland both provide services and products to investment management firms whose customers are institutional and private investors, such as pension funds, insurance companies, corporations, and mutual funds.  Investment management firms compete against one another for investors by, among other things, representing their ability to earn a high rate of return on the

1

DREIER STEIN KAHAN
BROWNE WOODS GEORGE LLP

1   funds invested by them. Rate(s) of returns are used as a measurement of how well

2   the investment management firm performs for the investor and the use of these

3   measures is known in the industry as "investment performance" and/or

4   "performance measurement".

5           6.      In order to ensure that the presentation of investment returns is

6   comparable across investment management firms, the investment community has

7   adopted standards known as the Global Investment Performance Standards

8   ("GIPS®")[1]. GIPS are a set of standardized, industry-wide ethical principles that

9   provide investment management firms with guidance on how to calculate and report

10  their investment results to prospective clients. Investment management firms

11  choose to comply with GIPS in order to compete with other firms and provide

12  investors with the ability to make comparisons between investment management

13  firms.

14          7.      Investment management firms that market themselves as

15  complying with GIPS often choose to "verify" (although verification is not

16  mandatory), that they are in compliance with the GIPS standards. "Verification" is

17  the review of an investment management firm's policies and procedures and its

18  claimed rate(s) of return (a.k.a. performance measurement) on the funds it invests

19  by an independent third-party "verifier". "Verification" tests: (a) whether the

20  investment management firm has complied with all the requirements of the GIPS

21  standards on a firm-wide basis and (b) whether the firm's processes and procedures

22  are designed to calculate and present investment performance data in compliance

23  with the GIPS standards. The primary purpose of the verification services is to

24  establish that an investment management firm claiming compliance with GIPS has

25  in fact done so.

26

27

28  [1] GIPS is analogous to the commonly used accounting standard known as Generally Accepted
    Accounting Principles, or "GAAP."

DREIER STEIN KAHAN
BROWNE WOODS GEORGE LLP

COMPLAINT

8.     Wilshire is informed and believes and based thereon alleges that Ashland provides, among other things, such verification services to investment management firms.  Investment management firms hire Ashland's GIPS verification services group to conduct "audits" of the investment management firms' processes, procedures and data in order to verify that the investment management firms have complied with the GIPS standards.  Ashland had been performing the verification process by rudimentary Excel spreadsheets and manually inputting data.  In addition to providing verification services, Ashland's performance resource group, also provides performance measurement services to their investment management clients to calculate and analyze performance measurement data (e.g., rate(s) of returns) for their clients.

9.     Wilshire provides consulting, asset management and investment technology products and services to the investment community.  Wilshire's investment technology products and services are directed to both investment management firms and "verifiers" such as Ashland which in turn provide services to investment management firms. Wilshire's products and services include software that perform investment accounting, performance measurement, performance attribution, risk management, portfolio optimization, trade order management, and marketing and client servicing support for multi-currency portfolios.  Wilshire's products which are relevant to its contractual relationship with Ashland and the claims herein consist of the Wilshire iQComposite, the Wilshire iQPerformance and the Wilshire Abacus which are performance measurement packages of software and services.

**A.     The Agreement**

10.     Wilshire and Ashland are parties to a written contract, entitled "Relationship Agreement," entered into as of May 17, 2007, and amended by, *inter alia*, a First Amendment dated as of July 24, 2007 (unexecuted) and Second Amendment to the Relationship Agreement dated as of October 11, 2007, copies of

3

DREIER STEIN KAHAN
BROWNE WOODS GEORGE LLP

1   which are attached hereto as Exhibit 1 and incorporated herein by reference. The

2   Relationship Agreement as amended is referred to herein as the "Agreement."

3                          (i)    **The Services Provided Under The Agreement**

4           11.    In general, the Agreement provides that Wilshire will provide

5   certain of its proprietary investment technology products, specifically, the Wilshire

6   iQComposite, the Wilshire iQPerformance and Wilshire Abacus (collectively, the

7   "Wilshire Products") to Ashland. The Agreement further provides that Wilshire

8   will provide scheduled programming and technology support as mutually agreed

9   upon.

10          12.    The two primary objectives of the Agreement were: (a) for

11  Wilshire to provide Ashland with technology which would dramatically upgrade

12  and streamline Ashland's ability to provide its verification services to its

13  investment management firm clients; and (b) for Ashland to market and distribute

14  Wilshire's products to Ashland's clients thereby allowing Ashland to provide

15  additional services through its performance resource group to its investment

16  management firm clients. Wilshire was to provide Ashland with technology by

17  (a) providing the Wilshire Products for Ashland's utilization and training Ashland

18  personnel for such utilization, and (b) providing scheduled development of further

19  enhancements to the Wilshire Products.

20          13.    The Agreement provides for two (2) different components of the

21  parties' contractual relationship which are defined as Opportunities. The first

22  component called "Opportunity 1," provides that Ashland will use the Wilshire

23  Products for Ashland's internal verification purposes, i.e. for use by Ashland's

24  verification group to assist in providing its verification services to its investment

25  management firm clients. The second component consists of "Opportunity 1.2,"

26  "Opportunity 2," and "Opportunity 3," wherein Ashland is obligated to market,

27  distribute and service the Wilshire Products to Ashland's investment management

28  firm clients through their performance resource group.

4

DREIER STEIN KAHAN
BROWNE WOODS GEORGE LLP

DREIER STEIN KAHAN
BROWNE WOODS GEORGE LLP

(i)    **Payments Due From Ashland To Wilshire Pursuant To The Agreement**

14.    Among Ashland's obligations under the Agreement are its obligation to pay Wilshire for: (a) the Wilshire Products utilized by Ashland for verification purposes (Opportunity 1), and (b) for access to the Wilshire Products through Ashland's performance resource group by Ashland's clients (Opportunity 1.2, Opportunity 2, and Opportunity 3).

15.    Each of the Opportunities provide for a sliding scale of fees (the "Opportunity Fees") which depend upon the number of clients for which Ashland utilizes the Wilshire Products as well as the specific Wilshire Product itself.  For example, under Opportunity 1, Wilshire is entitled to: (a) $2,000.00 per client for the first 250 clients for which Ashland uses the Wilshire Products for its verification process; (b) $1,750.00 per client for clients numbered 250 through 500 for which Ashland uses the Wilshire Products, and; (c) $1,500.00 per client for clients numbered 500 through 750, etc.  Similarly, under Opportunity 1.2, Wilshire is entitled to: (a) $3,000.00 per client for the first 250 clients which utilize the Wilshire Products through Ashland; (b) $2,000.00 per client for clients numbered 250 through 500, etc.

16.    Opportunity 1 is subject to a minimum annual fee of $500,000.00 ("Minimum Annual Fee").  Because the Agreement went into effect on May 17, 2007, Ashland is obligated to pay Wilshire a pro – rated Minimum Annual Fee of $250,000.00 for 2007.  For each calendar year thereafter, in the event fees paid by Ashland to Wilshire under Opportunity 1 are less than the Minimum Annual Fee in any calendar year, Ashland is required to pay Wilshire the difference between the amounts actually paid to Wilshire during that particular year under Opportunity 1 and the Minimum Annual Fee.

17.    Ashland is obligated to pay the Opportunity Fees each quarter on the 15th day after the end of each quarter.

5

18.    For the first quarter of 2008, Ashland is obligated to pay Wilshire for the clients for which the Wilshire Products are utilized. Wilshire is informed and believes that as of the end of the first quarter of 2008, there are 279 companies for which Ashland is utilizing the Wilshire Products under Opportunity 1 and 17 companies for which Ashland is utilizing the Wilshire Products under Opportunity 1.2. Pursuant to Opportunity 1, Wilshire is entitled to $2,000.00 per client for the first 250 clients, $1,750.00 for the next 29 clients (or $550,750.00 on an annualized basis) and under Opportunity 1.2 Wilshire is entitled to $3,000.00 per client for all 17 clients (or $51,000.00 on an  annualized basis). These two amounts total $601,750.00 on an annualized basis or $150,437.50 for the first quarter of March 2008.

19.    For the amounts that will become due and payable to Wilshire until the Agreement is terminated, Ashland is obligated to pay Wilshire not less than $2,159,671.79, which amount is the Minimum Annual Fee that Ashland is obligated to pay Wilshire until the 90th day after the fifth anniversary of the Effective Date of the Agreement which is the first date that the Agreement may be terminated upon the notice of either party (which date would be August 14, 2012). (The minimum amount owed by Ashland of $2,159,671.79 is derived by summing $500,000.00 per year for 2008- 2011 and 227/366 days for 2012 for a total of $2,310,109.29, and taking into account the 150,437.50 Minimum Annual Fee already due for the first quarter of 2008, which leaves a balance of $2,159,671.79 as the minimum amount that would become due and payable to Wilshire until such termination.)

20.    Section 9.5 of the Agreement provides that in the event Wilshire terminates the Agreement, then Wilshire will continue to make available all products covered under the Agreement for the cost of $1.00 for a period of 24 months after termination. Section 9.6 of the Agreement in the event that Ashland

6

1   terminates the Agreement, then Ashland will continue to pay Wilshire for a period
2   of 12 months after termination at the going rate.

3       21.    The Agreement expressly provides that except for the Minimum
4   Fees, entering into the Agreement did not guarantee any revenue or business for
5   either party. The Agreement provides that at any time after the fifth anniversary of
6   the Effective Date of the Agreement (which date would be May 16, 2012) either
7   party may terminate the agreement on ninety (90) days written notice to the other
8   party. The expectation of the Minimum Annual Fee being paid by Ashland to
9   Wilshire through at least the fifth anniversary of the Effective Date was a material
10  inducement for Wilshire to enter into the Agreement.

11      22.    The Agreement expressly provides that neither the Agreement
12  itself, nor any terms and conditions contained therein shall be construed as creating
13  or constituting a partnership, joint venture or agency relationship between the
14  parties.

### (CLAIM FOR DECLARATORY JUDGMENT)
### (28 U.S.C. §§ 2201, 2202)

17      23.    Wilshire repeats and realleges the allegations set forth in
18  paragraphs 1 through 22 hereinafter as if the same were fully set forth at length
19  herein.

20      24.    An actual controversy has arisen and now exists between
21  Wilshire, on the one hand, and Ashland, on the other, concerning the respective
22  rights and duties of the Parties under the Agreement.

23      25.    Wilshire contends that:
24              (i)    Wilshire has substantially complied with the terms and
25                  provisions of the Agreement and any alleged
26                  noncompliance on its part has been caused by Ashland's
27                  failure and/or refusal to comply with the terms and
28                  provisions of the Agreement.

DREIER STEIN KAHAN
BROWNE WOODS GEORGE LLP

7

1

      (ii)    Pursuant to the Agreement, Ashland was obligated to pay

2

              to Wilshire the Minimum Annual Fee for 2007, in the

3

              amount of $250,000.00, which fee was due on or before

4

              January 31, 2008.

5

      (iii)   Ashland does not have the right pursuant to the

6

              Agreement to withhold payment from Wilshire of the

7

              Minimum Annual Fee now due for 2007 and is

8

              wrongfully withholding payment of the Minimum Annual

9

              Fees.

10

      (iv)   Pursuant to the Agreement, Ashland was obligated to pay

11

              to Wilshire a total of $150,437.50 for first quarter of

12

              March 2008, which fee became due on April 30, 2008.

13

      (v)    Pursuant to the Agreement, Ashland is obligated to pay

14

              Wilshire $2,159,671.79, the Minimum Annual Fee

15

              Ashland will be obligated to pay to Wilshire, through

16

              August 14, 2012.

17

      (vi)   Pending the orders of this Court, Wilshire will continue to

18

              substantially comply with the terms and provisions of the

19

              Agreement.

20       26.    Ashland's obligation to pay Wilshire the Minimum Annual Fees

21 under Opportunity 1 is contingent upon the start of Ashland's client data

22 implementation which first occurred on in August 2007 and is not contingent on

23 whether Ashland elects to fully implement the Wilshire Products in the verification

24 process.

25       27.    Ashland's obligations to pay Wilshire the fees, under

26 Opportunities 1.2, 2 and 3 are contingent upon the start of Ashland client data

27 implementation which Ashland started implementing in August 2007 and are not

28

8

1   contingent on whether Ashland's use of the Wilshire Products generates revenue for

2   Ashland. Ashland retains sole control over the fees it charges (if any) its clients.

3         28.    To date Ashland has failed and refused to pay any monies

4   pursuant to the terms and provisions of the Agreement whatsoever.

5         29.    Wilshire is informed and believes and based thereon alleges that

6   Ashland disputes the foregoing contentions and contends otherwise.

7         30.    Wilshire desires a judicial declaration of its rights and duties

8   under the Agreement. A judicial determination is necessary and appropriate under

9   the circumstances so that the parties may proceed in accordance with their rights as

10  determined by the Court. In the interim, Wilshire intends to continue to honor its

11  obligations under the Agreement, including but not limited to providing its services

12  and products to Ashland in accordance with the Agreement.

13  **PRAYER FOR RELIEF**

14        WHEREFORE, Wilshire prays for judgment against Ashland as

15  follows:

16        31.    An order that Ashland specifically perform Ashland's

17  contractual obligations by paying the Minimum Annual Fee due for 2007 of

18  $250,000.00, and the Minimum Annual Fee due for the first quarter of 2008 of

19  $150,437.50 and continue to make the payments Ashland is obligated to make

20  pursuant to the terms and conditions of the Agreement, including without limitation

21  the Minimum Annual Fee, pending further orders of the Court;

22        32.    A declaration that if Ashland does not perform Ashland's

23  contractual obligations and pay Wilshire the amounts Ashland is obligated to pay

24  pursuant to the terms and provisions of the Agreement, then Wilshire shall have the

25  right to terminate the Agreement;

26        33.    A declaration that if Ashland does not perform Ashland's

27  contractual obligations and pay Wilshire the amounts Ashland is obligated to pay

28

DREIER STEIN KAHAN
BROWNE WOODS GEORGE LLP

9

1 pursuant to the terms and conditions of the Agreement then Wilshire shall have the

2 right to terminate Ashland's use of all Wilshire Products;

3       34.    A declaration that if Ashland does not perform Ashland's

4 contractual obligations to pay Wilshire the amounts Ashland is obligated to pay

5 pursuant to the terms and conditions of the Agreement then Wilshire shall have the

6 right to terminate its obligation to make available any of its products to Ashland

7 post-termination;

8       35.    A declaration that if Ashland does not perform Ashland's

9 contractual obligations to pay Wilshire the amounts Ashland is obligated to pay

10 pursuant to the terms and conditions of the Agreement then Wilshire shall have the

11 right to immediately remove all Wilshire Products installed on Ashland's

12 computers;

13       36.    For costs of suit and attorneys' fees incurred herein; and

14       37.    For such other and further relief as the Court may deem just and

15 proper.

16

17 DATED: May 7, 2008          DREIER STEIN KAHAN BROWNE WOODS
GEORGE LLP

18

19 By _____

20             Stanton L. Stein
            Attorneys for Plaintiff

21             Wilshire Associates Incorporated

22

23

24

25

26

27

28

DREIER STEIN KAHAN
BROWNE WOODS GEORGE LLP

10

**EXHIBIT 1**

#070513

## RELATIONSHIP AGREEMENT

THIS RELATIONSHIP AGREEMENT ("Agreement") is entered into as of May 17th, 2007 ("Effective Date") by and between Ashland Partners & Company LLP ("Ashland"), an Oregon Limited Liability Partnership with its principal office at 4400 Livingston Road, Central Point, OR 97502 and Wilshire Associates Incorporated ("Wilshire"), a California corporation with its principal office at 1299 Ocean Avenue, Santa Monica, CA 90401.

## RECITALS

WHEREAS, Wilshire is a provider of consulting, asset management and investment analytic services to the global investment management and plan sponsor communities and, through its WILSHIRE iQPERFORMANCE$^{SM}$, WILSHIRE iQCOMPOSITE$^{SM}$, and WILSHIRE ABACUS$^{SM}$ (collectively, "In-scope Wilshire Products," as described more fully in Attachment 1) is a developer and provider of proprietary analytical tools and databases that are used by professionals in those communities to calculate and present investment performance with associated security, account, and composite level reporting;

WHEREAS, Ashland is a provider of compliance and verification services in accordance with the Global Investment Performance Standards ("GIPS") as well as related SEC compliance services ("Ashland Products and Services") as further described in Attachment 1 ("Covered Products Definition"); and

WHEREAS, Ashland and Wilshire wish to establish an ongoing relationship on the terms and conditions of this Agreement relating to the license rights of In-scope Wilshire Products being offered by Ashland as part of the Ashland Products and Services and for cross-referral of their respective products and services.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged, the parties agree as follows:

1.      **Scope of Relationship** The parties hereby form a Relationship as described in Attachment 2 ("Scope of Relationship"), and each party agrees to perform the duties and responsibilities respectively assigned to it in Attachment 2. The parties shall make payments to each other and shall share in the revenue generated by the operation of the Relationship as set forth in Attachment 4.

2.      **Covered Products and Services**

        (a)      This Agreement and the Relationship applies to and covers only the specific In-scope Wilshire Products and Ashland Products and Services (collectively, "Covered Products"), set forth on Attachment 1 which the parties will revise and update from time to time as needed.

        (b)      Except for the minimum payment specifically set forth on Attachment 4, entering into this Relationship and executing this Agreement does not guarantee any revenue or business for any party.

3.      **Establishment of Dispute Resolution and Development Committee** The following two individuals from Wilshire and two individuals from Ashland are hereby designated as the dispute resolution and development committee (the "Committee"): Melvin W. Ashland, Cecilia Loo,

1

Tobin S. Cochran, and Jason Toledo. The Committee members will meet and confer from time to time, at the request of either party hereto and will be charged with evaluating and analyzing opportunities relating to, and managing and monitoring the progress of, the Relationship, including, without limitation, (i) planning, developing and monitoring a co-marketing strategy for Ashland to package the Wilshire services and products as necessary and to the extent defined in <u>Attachment 2</u> ("Scope of Relationship"), which includes identifying each party's commitments and obligations relative to the foregoing and (ii) addressing any other issues that Wilshire and Ashland agree that the Committee should address. Nothing in this agreement shall prevent Ashland or Wilshire from developing new product lines or programs which are rejected by the Committee. The Committee also will serve as the escalation point for disputes or disagreements between Wilshire and Ashland. Either party may at any time with notice to the other party change one or both of its designees to the Committee.

**4.    Committee Actions**

4.1    The Committee shall meet at least quarterly, or at the request of either party, either in person or by telephone. In order to permit the Committee to perform its roles effectively, each party shall promptly provide to the Committee all material information known to it that reasonably relates to all material planned developments in its products and services and all client opportunities relative to the Relationship. If the disclosing party determines there is a reasonable need for more immediate dissemination, such information shall be disclosed promptly to the members of the Committee without waiting for the next formal meeting of its members.

4.2    In furtherance of the Relationship, but subject to any confidentiality obligations or other restrictions imposed by the relevant third party(ies):

(a)    Each party shall provide to the other party, on a timely, periodic and confidential basis, advance information collected by the party regarding potential client prospects with respect to the In-scope Wilshire Products and/or Ashland Products and Services;

(b)    Each party will provide the other party with reasonable access to the Ashland Products and Services clients and the In-scope Wilshire Products clients as mutually agreed, as the case may be, in connection with advancing the purposes of the Relationship;

(c)    Each party will refer sales opportunities to the other party where appropriate, and the parties will mutually agree upon a sales strategy; and

(d)    Each party will cooperate as mutually agreed by the Committee in the review and preparation of bids to potential customers and in joint sales calls, product demonstrations or other joint marketing or promotional efforts.

4.3    For efficiency and consistency, the Committee may establish or approve guidelines governing news releases, public announcements, advertising or any other publicity (together, "Publicity") to be released jointly or by either party relating to this Relationship. Such guidelines notwithstanding, however, no party shall release any Publicity unless such Publicity is approved by both parties in advance or is required by law.

**5.    Other Covenants**

5.1    With respect to Opportunity 1 and Opportunity 2 clients (as set forth in Attachment 2), Wilshire will provide product, sales and support training to Ashland with respect

2

#070513

to the In-scope Wilshire Products on a "train-the-trainer" basis, sufficient to allow Ashland to conduct its activities and duties hereunder and to advance the interests of the Relationship as set forth and to the extent set forth herein.

5.2     Wilshire will participate in on-going training and support programs conducted by Ashland on an "as invited" basis.

## 6.     Confidentiality

6.1     Each party acknowledges and agrees that any and all information relating to the other party's business and not publicly known including, without limitation, technical processes and formulas, business methods, In-scope Wilshire Products, computer systems, names, address and information about users, clients, and advertisers, product designs, sales, costs and other unpublished financial information, product and business plans, and marketing data is confidential and proprietary information ("Confidential Information"). Each party agrees that, except with the prior written consent of the disclosing party (or any committee of the disclosing party charged with the authority of giving such consent), it will not disclose the other party's Confidential Information or use it for any purpose other than those permitted or required by this Agreement. Each party may disclose Confidential Information to its employees, consultants or agents who must have access to such Confidential Information to perform such party's obligations hereunder, who shall each treat such Confidential Information as provided herein. Each party shall take reasonable steps, at least substantially equivalent to the steps as it takes to protect its own Confidential Information, during the term of this Agreement (the "Term"), and thereafter, to prevent the unauthorized disclosure of any Confidential Information of the disclosing party. Confidential Information does not include information that is (i) publicly known, already known by, or in the possession of the non-disclosing party; (ii) is independently developed by the non-disclosing party without use or reference to the other party's Confidential Information; or (iii) is thereafter rightly obtained by the non-disclosing party from a source other than the disclosing party.  In the event that a party receiving Confidential Information is required to disclose Confidential Information of the other party by law, rule or regulation, or by court order, subpoena, warrant or similar process, such party may disclose such the required portion of the Confidential Information, provided that in the case of a court order, subpoena, warrant or similar process such party shall, unless prohibited by law, promptly notify the disclosing party of such process so that the disclosing party can seek a protective order.

6.2     Upon any termination of this Agreement, each party agrees to delete, destroy or return any and all Confidential Information to the other party, except to the extent that retention is required by law, or as otherwise mutually agreed to as part of the termination agreement.

6.3     Each party shall maintain commercially reasonable security measures designed to (i) ensure the security and confidentiality of the other party's Customer Information (as defined below), (ii) protect against any threats or hazards to the security of such Customer Information, and (iii) protect against unauthorized access to or use of such Customer Information that could result in harm or inconvenience to the other party or its customers. Each party shall implement measures designed to address new risks and threats to the security of the other party's Customer Information as such risks and threats are identified. Each party shall from time to time review its information security program with the other party at the other party's request. Each party shall promptly notify the other party about any actual or attempted unauthorized access to or use of the other party's Customer Information. As used herein, the term "Customer Information" means any information concerning or relating to the other party's customers, including without limitation customer names, addresses, telephone numbers, and account and portfolio information.

3

6.4     The provisions of this Section 6 shall survive the termination or expiration of this Agreement for any reason.

7.      **Other Opportunities**   Notwithstanding anything to the contrary herein, a party hereto shall not be prevented or restricted from taking any action or pursuing any opportunity, including any actions or opportunities that are competitive with the other party's services and products or that are taken or pursued with competitors of the other party, so long as such actions or opportunities (i) do not involve the use or disclosure of Confidential Information of the other party, (ii) do not involve Wilshire entering into a similar arrangement with another entity with respect to products which are substantially similar to the Ashland Products and Services outlined in Attachment 1, and (iii) do not involve Ashland entering into a similar arrangement with another entity with respect to products which are substantially similar to the In Scope Wilshire Products.

8.      **Indemnification**

8.1     Except as provided in Section 8.3, Wilshire shall indemnify Ashland, its employees, agents, officers, shareholders, directors and affiliates for, and defend and hold Ashland harmless from and against, any costs (including attorneys' fees) incurred by Ashland or damages finally awarded against Ashland and/or settlements payable to a third party that arise out of (i) any claim that any of the In-scope Wilshire Products infringe or violate any applicable copyright, patent, trade secret, trademark or proprietary rights of any third party, (ii) any use of the In-scope Wilshire Products by any Wilshire customer, or (iii) any breach by Wilshire of its obligations hereunder. Notwithstanding any other provision of this Agreement to the contrary, Wilshire shall not under any circumstances be responsible for or indemnify any party with respect to, on account for, or in connection with any investment losses, lost profits or intangible losses, including but not limited to losses to business goodwill or reputation, claimed by any party arising out of the provision of the Wilshire services hereunder or any other act performed pursuant hereto. For these purposes, customers are to be delineated by opportunity type. In Opportunity 1, Ashland will be Wilshire's client. Clients under Opportunity 1.2, 2.0 and 3.0 will be Ashland clients.

8.2     Except as provided in Section 8.3, Ashland shall indemnify Wilshire, its employees, agents, officers, shareholders, directors and affiliates for, and defend and hold Wilshire harmless from and against, any costs (including attorneys' fees) incurred by Wilshire or damages finally awarded against Wilshire and/or settlements payable to a third party that arise out of (i) any claim that any of the Ashland Products and Services infringe or violate any applicable copyright, patent, trade secret, trademark or proprietary rights of any third party or (ii) any use of the Ashland Products and Services by any Ashland Customer, or (iii) investment losses resulting from any use of the In-scope Wilshire Products by any Ashland Customer, unless such losses are caused by Wilshire's intentional misconduct or (iv) any breach by Ashland of its obligation hereunder to ensure that all vendor license agreements are in place to secure redistribution capabilities.

8.3     In order to qualify for indemnity under this Section 8, the indemnitee must give the indemnitor prompt written notice of any such claim or liability, and allow the indemnitor solely to control the defense of such claim and all related settlement negotiations and fully cooperate with the indemnitor in such defense and negotiations. In the event that the indemnitee wishes to participate in the defense of any such claim, the indemnitor shall allow the indemnitee to participate at the indemnitee's own expense. The indemnifying party shall enter into no

4

settlement without the consent of the indemnified party that would cause the indemnified party to pay damages or incur any costs or to be limited or restricted in any way.

## 9.  Term and Termination

9.1      The term of the Agreement commences on the Effective Date. Following the fifth (5th) anniversary of the Effective Date, this Agreement will operate on a continuous basis until terminated by either party with ninety (90) days notice in writing to the other party.

9.2      The Agreement may be terminated by a party upon the occurrence of any of the following events:  (i) either party generally ceases to provide its respective Covered Products set forth in Attachment 1to its customers; or (ii) a change in control of either party.

9.3      Either party may terminate this Agreement effective immediately upon notice to the other party, if at any time the other party:

(a)      files a voluntary petition for bankruptcy;

(b)      is the subject of an involuntary petition for bankruptcy that is not dismissed within sixty (60) days after its filing;

(c)      has a trustee or receiver is appointed by a court for all or a substantial portion of its respective assets;

(d)      has a court assume jurisdiction of its assets under a reorganization act;

(e)      becomes insolvent or suspends business;

(f)      makes an assignment of its assets for the benefit of creditors; or

(g)      enters into a composition for the benefit of creditors.

9.4      Unless the parties agree to the contrary, the termination of this Agreement for any reason shall not relieve a party of its obligations:

(a)      to maintain its confidentiality obligations set forth above in Section 6;

(b)      to make such indemnification as is set forth in Section 8.

9.5      Notwithstanding any other section in this agreement, the following shall apply to Wilshire upon Wilshire's action to cause a termination of this agreement after the Term.  All parties to this agreement understand the intent of Ashland to use the Wilshire iQComposite in their verification business.  Both parties also understand that the verification business is the core product and income source for Ashland.  Therefore, to protect Ashland from incurring any unforeseen financial cost from a termination of this agreement by Wilshire after the Term, Wilshire hereby agrees to the following financial remedies as well as the right for Ashland to develop its own product(s):

(a) For a period of twenty-four (24) months following the notice of termination by Wilshire, all products covered by this agreement will be made available, to Ashland for the cost of one dollar ($1.00).

5

#070513

(b)  Wilshire shall not interfere with Ashland in developing said products and with Ashland's ability to replace existing installations using the Wilshire products with installations using the Ashland products.

(c)  Nothing in this agreement shall prevent Ashland from notifying its clients that the Wilshire relationship has been terminated by Wilshire.

9.6     Notwithstanding any other section in this agreement, the following shall apply to Ashland upon Ashland's action to cause a termination of this agreement after the Term.  All parties to this agreement understand that Wilshire will have devoted substantial valuable resources to support and develop Wilshire's technology aimed at helping Ashland grow Ashland's business.  Both parties also understand that the In Scope Wilshire Products provided to Ashland hereunder are a core product and income source for Wilshire.  Therefore, to protect Wilshire from incurring any unforeseen financial costs from a termination of this agreement by Ashland after the Term, Ashland hereby agrees to the following financial remedies:

(a)  For a period of twelve (12) months following the notice of termination by Ashland, Ashland will continue to pay Wilshire the fees due Wilshire as set forth on Attachment 4 hereto.  These fees will be based on the then applicable run rate of revenue as outlined in Attachment 4.

**10.     Limitation of Liability and Disclaimer**

10.1     LIABILITY.  EXCEPT FOR THE INDEMNIFICATION OBLIGATIONS SPECIFICALLY SET FORTH IN SECTION 8 OF THIS AGREEMENT, LIABILITY FOR BREACH OF THE CONFIDENTIALITY PROVISIONS SET FORTH ABOVE, LIABILITY FOR PERSONAL INJURY OR PROPERTY DAMAGE, LIABILITY FOR GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, OR THE OBLIGATION TO PAY MONEY UNDER THIS AGREEMENT, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR DIRECT DAMAGES IN EXCESS OF THE AGGREGATE AMOUNT PAID TO WILSHIRE UNDER THIS AGREEMENT OR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES (EVEN IF THAT PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES) ARISING FROM THIS AGREEMENT, SUCH AS, BUT NOT LIMITED TO, LOSS OF REVENUE OR ANTICIPATED PROFITS OR LOST BUSINESS.

10.2     NO WARRANTIES. EXCEPT AS PROVIDED IN SECTION 10.4, THERE ARE NO WARRANTIES OF EITHER PARTY UNDER THIS AGREEMENT.  THE IN-SCOPE WILSHIRE PRODUCTS ARE PROVIDED BY WILSHIRE "AS IS", AND ALL EXPRESSED OR IMPLIED WARRANTIES AND REPRESENTATIONS OF ANY KIND WITH RESPECT TO THE IN-SCOPE WILSHIRE PRODUCTS OR THE PERFORMANCE OF EITHER PARTY ARE HEREBY DISCLAIMED, INCLUDING, BUT NOT LIMITED TO, (A) WARRANTIES AS TO MERCHANTABILITY OR USE FOR A PARTICULAR PURPOSE (INCLUDING INVESTMENT DECISIONS), WHETHER OR NOT A PARTY  KNOWS OR HAS REASON TO KNOW OR HAS BEEN ADVISED OF ANY SUCH PURPOSE, (B) WARRANTIES AS TO ANY RESULTS TO BE OBTAINED FROM ANY USE OF THE PRODUCT OR INFORMATION DERIVED FROM THE IN-SCOPE WILSHIRE PRODUCTS OR SERVICES OR OTHER PRODUCTS PROVIDED BY EITHER PARTY OR (C) ANY REPRESENTATION OR WARRANTY THAT THE IN-SCOPE WILSHIRE PRODUCTS ARE

6

#070513

IN ANY WAY GUIDANCE FOR ANY INVESTOR OR INVESTORS IN GENERAL TO DETERMINE THE SUITABILITY OR DESIRABILITY OF THE INVESTMENT IN A PARTICULAR SECURITY, OR SECURITIES IN GENERAL.

    10.3    To the extent that any implied warranties cannot be disclaimed under applicable law, any such implied warranties are limited in duration to thirty days from the delivery date. Wilshire does not guarantee the sequence, timeliness, accuracy or completeness of the In-scope Wilshire Products or any other Wilshire products; provided, however, that Wilshire shall use commercially reasonable efforts to correct at its expense any such delays, inaccuracies, errors or omissions as soon as practicable.

    10.4    Wilshire represents and warrants (or covenants as the case may be) to Ashland that: during the Term, (1) the In-scope Wilshire Products shall function substantially in accordance with their specifications and documentation, (2) Wilshire shall use commercially reasonable efforts to ensure that the In-scope Wilshire Products (including any data) are free from any material defects, bugs, worms, viruses or similar defects, (3) except for custcmary passwords provided by Wilshire for use by authorized users, it has not included in the In-scope Wilshire Products any code or device designed to (A) cause the Product to cease operating or render it incapable of processing data, or (B) permit any person to access the Product or any system on which it is installed without Ashland's prior knowledge and consent, (4) Wilshire shall use commercially reasonable efforts to ensure that the In-scope Wilshire Products are maintained to a level of marketability under current market conditions, and (5) Wilshire will obtain any necessary rights from third party vendors (excluding Ashland's obligation to ensure that all vendor license agreements are in place to secure redistribution capabilities), owns or otherwise has the right to license its Covered Products under the terms of this Agreement and there are no claims (existing, or to Wilshire's knowledge, threatened) against Wilshire that its Covered Products infringe on any third party's intellectual property rights.

    10.5    ASHLAND'S WARRANTIES  Ashland represents and warrants (or covenants as the case may be) to  the following: (1) during the Term, Ashland shall use commercially reasonable efforts to utilize the In-scope Wilshire Products in their verification business, (2) Ashland will obtain any necessary rights from third party vendors (excluding Ashland's obligation to ensure that all vendor license agreements are in place to secure redistribution capabilities), owns or otherwise has the right to license its Covered Products under the terms of this Agreement and there are no claims (existing, or to Ashland's knowledge, threatened) against Ashland that its Covered Products infringe on any third party's intellectual property rights.

**11.**    **Equitable Relief**    The parties acknowledge that in the event of any breach of a party's intellectual property rights or of the confidentiality provisions set forth in Section 6, the aggrieved party may not have an adequate remedy at law.  Consequently, the parties agree that each party shall be entitled to seek the remedies of temporary and permanent injunction, specific performance or any other form of equitable relief without the necessity of proving actual damages or irreparable injury.  This provision shall not, however, be construed as a waiver of any rights or defenses that Wilshire or Ashland may have for damages, or any other remedies to which a party may be entitled.

**12.**    **Force Majeure; Interruptions; Security**    Neither party shall be liable hereunder by reason of any failure or delay in the performance of its obligations hereunder (except for the payment of money) on account of strikes, shortages, riots, insurrection, fires, flood, storm, explosions, earthquakes, acts of God, war, governmental action or any other similar cause, provided such cause is beyond the reasonable control of such party (each a "Force Majeure

Event"). Interruptions in Internet service or telephone service (including due to a virus, electrical delivery problem or similar occurrence), excluding interruptions due to problems that are within such party's reasonable ability to control that affect Internet users generally, or in the local area in which such party is located, shall each be a Force Majeure Event for purposes of this Agreement. Each party will use its reasonable best efforts to promptly notify the other party of the occurrence of a Force Majeure Event.

**13.    Miscellaneous**

13.1  All formal notices required hereunder that may be given by any party to the other pursuant to this Agreement shall be in writing and shall be sent by certified or registered mail, return receipt requested, or by Federal Express or similar overnight delivery service that records delivery to the addresses set forth below, or to such other address as the parties may designate, from time to time, by written notice to the other:

If to Wilshire to:                            If to Ashland:

Wilshire Associates Incorporated             Ashland Partners & Co. LLP
1299 Ocean Avenue                            4400 Livingston Road
Santa Monica, CA 90401                       Central Point, OR 97502
Attn:  Jason Totedo                          Attn:  Melvin W. Ashland

With a copy to:                              With a copy to:

Wilshire Associates Incorporated             Ashland Partners & Co. LLP
1299 Ocean Avenue, Suite 700                 3549 Lear Way, Suite 105
Santa Monica, CA 90401                       Medford, OR  97504
Attn:  General Counsel                       Attn:  Tobin S. Cochran

All other notices demands, requests, or other communications hereunder may be sent by the foregoing procedures or by email or regular mail.  All notices, demands, requests, or other communications shall be effective upon receipt.

The parties are authorized to communicate with each other through the Internet, and each party acknowledges that use of electronic mail systems or other communication services that use the Internet involve the transmission of information through computer systems that are not controlled or maintained by either Ashland or Wilshire. Because of the nature of Internet communications, each party acknowledges that the privacy, confidentiality, timeliness and integrity of information transmitted over the Internet in connection with this agreement cannot be assured. Nevertheless, the parties authorize each other to provide information relating to the Agreement through electronic mail systems or other communication services that use the Internet and accept and rely on communications so received through Internet communications services, although each party hereto reserves the right to require that specific communications be provided in writing. Both parties agree that neither shall be liable to the other for any damages resulting from the use of Internet communications, provided that the use of electronic communications was reasonable under the circumstances and any such damages resulted from acts beyond the party's control.

13.2  This Agreement shall be governed by the laws of the State of California, excluding its conflict of law principles.  Each party hereby submits to the exclusive jurisdiction of any

8

#070513

federal or state court in Los Angeles County, California for purposes of all legal proceedings arising out of or relating to the non-payment of fees under this Agreement.  Each party irrevocably waives, to the fullest extent permitted by applicable law, any objection which it may now or hereafter have to the laying of venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum.  EACH PARTY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT.

13.3  In the event of any dispute arising under this Agreement, prior to instituting any formal action, the parties shall attempt, in good faith, to resolve the dispute between them within thirty (30) days after one party notifies the other that a dispute exists. If a dispute cannot be resolved between the parties in that thirty- (30) day period, the parties shall refer the matter to a senior executive of Wilshire and Ashland, respectively, if those executives have not previously been involved in the resolution process during the thirty- (30) day period, and those executives shall attempt to resolve the matter within five (5) days.  Nothing herein shall be deemed to limit either party's right to seek immediate injunctive relief to prevent irreparable injury.

13.4  Neither this Agreement, nor any terms and conditions contained herein shall be construed as creating or constituting a partnership, joint venture or agency relationship between the parties.  Neither party shall have the power to bind the other or enter obligations on the other's behalf without the other's prior written consent.

13.5  Neither this Agreement, nor either party's rights or obligations hereunder shall be assigned or transferred by either party without the prior written consent of the other party. Notwithstanding the foregoing, no consent shall be necessary in the event of an assignment to a successor or other transferee resulting from a merger, acquisition, consolidation or sale of substantially all assets by either party or assignment to an entity under common control with, controlled by or in control of either party so long as notice is promptly given and such successor or transferee is not a material, direct competitor of the non-transferring party.  Any assignment not incompliance with this Section 13.5 is void.

13.6  This Agreement includes the Attachments hereto, each of which is incorporated herein by reference. This Agreement constitutes the entire agreement and understanding between the parties hereto and supersedes any and all prior agreements and understandings, oral or written, relating to the subject matter hereof.

13.7  In the event any of the terms or provisions of this Agreement shall be held to be unenforceable, the remaining terms and provisions shall be unimpaired and the unenforceable term or provision shall be replaced by such enforceable term or provision as comes closest to the intention underlying the unenforceable term or provision.

13.8  Except as specifically provided for in this Agreement, or in any other written agreement between the parties, neither party shall use the other party's name, the name of the other party's products, or the name of the other party's customers in any marketing, advertising or other publicity without the other party's prior written consent.

13.9 Each party shall have the right, at its expense and no more than once (1) in any six (6) month period, to direct its agents and/or independent professional advisors to visit the other party's premises and audit the other party's relevant books and records on a confidential basis, at reasonable times and after at least ten (10) days prior notice, for the purpose of confirming that the payments made hereunder conform to the terms and conditions of this Agreement. Each party

#070513

shall maintain reasonably detailed records sufficient to permit the other party to conduct audits under this Section 13.9.

13.10 The parties shall use commercially reasonable efforts to negotiate and execute, within seventy five (75) days following the Effective Date, an addendum to this Agreement which sets forth mutually acceptable template license, hosting and support agreements to be used in connection with the transactions contemplated by this Agreement. In the event the parties have not executed such an addendum within such period, either party may terminate this agreement, without penalty, by written notice to the other party within ten (10) days following the expiration of such period (or expiration of any extension agreed upon in writing by the parties, which shall be negotiated in good faith upon the request of either party), in which event any amounts paid by either party to the other shall be promptly refunded and this Agreement shall be void and of no further force and effect.

The following signatures signify acceptance of this Agreement by Wilshire and Ashland.

For Wilshire:                          For Ashland:

Wilshire Associates Incorporated       Ashland Partners & Company LLP


Signature:                             Signature:
Name:
Title:

Cecilia I. Loo, Managing Director

                                       Name:  Melvin W. Ashland, CPA/PFS
                                       Title:  Managing Partner/CEO


                                       Signature:

                                       Name:  Tobin S. Cochran
                                       Title:  Partner/President

1

#070513

# ATTACHMENT 1

## COVERED PRODUCTS DEFINITION

**"In-scope Wilshire Products":** In-scope Wilshire Products include:

### 1) Wilshire iQComposite

| | |
|---|---|
| Features: | Data Warehouse |
| | Portfolio and Composite level reporting |
| | GIPS compliance support |
| | Data Validation tools |

### 2) Wilshire Abacus and Wilshire iQPerformance

| | |
|---|---|
| Features: | Portfolio/Security level performance measurement |
| | Daily TWRR calculation methodology |
| | Customized reporting classification |
| | Portfolio vs. Benchmark reporting |
| | Reconciliation tools |

1) **"Ashland Products and Services":**     Ashland Products and Services may include: any product or service, as outlined below, offered by Ashland Technology Group LLC (ATG) which supplements and/or supports directly or indirectly, Ashland Partners & Company LLP (AP), Ashland Compliance Group LLC (ACG), and Ashland Performance Resource Group LLC (APRG).
2) Firm-wide Compliance and Technology Hosting Solutions (ATG)
3) GIPS Compliance & Verification Services (AP)
4) Performance Examination Services  (AP)
5) SEC Compliance Consulting Services (ACG)
6) Investment Performance Consultation, Compilation and Outsourcing Services (APRG)

#070513

# ATTACHMENT 2

## SCOPE OF RELATIONSHIP

**Prospect/Client breakdown as set forth in Attachment 4**

| | |
|---|---|
| **Opportunity 1 and 1.2** | **Hosted Solution, internal and external to clients with AUM less than or equal to $2.5 billion** |

**Objective:**   Ashland will use the Wilshire iQComposite to aid in its internal verification process enabling Ashland to streamline workflow thereby increasing efficiencies to accelerate and increase Ashland's verification business.

Additionally, Ashland can market the service associated with the Wilshire iQComposite to clients with less then $2.5 Billion in assets under management (AUM). Such clients will be provided access to the Wilshire iQComposite through Ashland.

In both of these cases Wilshire will train Ashland in the use of the product and will provide support to Ashland on a "train-the-trainer" basis.

**Wilshire:**   Provides Ashland with:

- The opportunity to utilize the Wilshire iQComposite application to streamline work and data flow specifically for Ashland's Products and Services

- Streamlined operations to increase Ashland's efficiencies within Ashland's Products and Services

- Scheduled programming and technology support as agreed to by the Committee for enhancement to the existing programs and newly developed programs

- The opportunity to market and distribute the Wilshire iQComposite solution, thereby providing a differentiating product and streamlining work and data flow exchange

- A proven and reliable performance analytics provider with a track record of satisfying the needs of clients and investors complementing Ashland's extensive experience

- Programming and analytical knowledge to remedy programming concerns agreed to by the Committee

1

#070513

| | |
|---|---|
| **Ashland:** | Provides Wilshire with: |

- Valuable experience and market information aimed at enhancing the In-scope Wilshire Products offering

| | |
|---|---|
| **Opportunity 2** | **Co-Marketing the Wilshire iQComposite** |
| **Objective:** | Wilshire and Ashland will jointly market the Wilshire iQComposite solution to clients with AUM greater than $2.5Billion. These opportunities can take two different forms: |

i)   Ashland will enter into an agreement with the client to provide Ashland's existing services, data implementation, and on-going client service support. Under every such agreement, there will be a separate, clearly delineated fee (the "Wilshire Pass-Through Fee") due Wilshire for the underlying Wilshire technology. The Wilshire Pass-Through Fee will be determined in each case in accordance with the enclosed Attachment 4 and approved by Wilshire in writing in advance.   These agreements will be limited to opportunities where the client is currently contracted with Ashland, and/or wants to utilize the Ashland "full service model" incorporating consultation, implementation and on-going client service support provided by Ashland. Wilshire will only train Ashland employees, in a "train the trainer" capacity.

ii)   Where the client does not wish to so utilize Ashland, Wilshire enters into an agreement directly with the client. In these cases, Wilshire will be providing implementation, training and on-going support directly to the client.

| | |
|---|---|
| **Wilshire** | Provides Ashland with: |

- An opportunity to jointly market the Wilshire iQComposite to managers with greater than $2.5 Billion AUM.
- Continued scheduled development of the In-scope Wilshire Products as mutually agreed upon.

| | |
|---|---|
| **Opportunity 3** | **Performance Measurement Outsourcing** |
| **Objective:** | Ashland will use the In-scope Wilshire Products, specifically the Wilshire Abacus and the Wilshire iQPerformance, to support the outsourced performance measurement process enabling Ashland to streamline workflow thereby increasing efficiencies to accelerate and increase Ashland's performance measurement outsource business. |

Wilshire will train Ashland in the use of the products and will provide support to Ashland on a "train-the-trainer" basis.

1

#070513

| | |
|---|---|
| **Wilshire** | provides Ashland with: |

- A platform incorporating In-scope Wilshire Products to be utilized by the Ashland Performance Resource Group (APRG) supporting the outsourced performance measurement business.

All sales under this opportunity will be between APRG and their client. Under every such agreement, there will be a Wilshire Pass-Through Fee due Wilshire for the underlying Wilshire technology. The Wilshire Pass-Through Fee will be determined in each case in accordance with the enclosed Attachment 4 and approved by Wilshire in writing in advance.

**Relationship Agreement:**    Ashland and Wilshire are entering into the Agreement to develop and expand each party's respective opportunities with each other's customers with regards to the In-scope Wilshire Products, and the Ashland Products and Services, in exchange for compensation arrangements outlined in Attachment 4.

## 1. General Undertakings

Any time after the Effective Date, Ashland may begin to implement the Opportunities described herein to its customers and prospects. Thereafter, if and to the extent necessary, parties will enter into good faith discussions with respect to any additional terms and conditions applicable hereunder.

## 2. Technology Deployment

(i)      All deployment associated with Opportunity 1, 1.2, 2 and 3 will be hosted by ATG, a designated provider of hosting solutions, or Wilshire at the then prevailing rate.

(ii)      Opportunity 2 may be deployed at the client site. Should this opportunity take the form of an Ashland client, where Ashland enters into an agreement with the client to provide Ashland's existing services, data implementation, and on-going client service support, any technology issues that arise due to the deployment are the responsibility of ATG technology support, and Wilshire will provide support to Ashland only on a "train the trainer" basis.

## 3. Client Service Support Model

Client service support with respect to the relationship means the following: direct interface with the client, data implementation including data validation for accuracy and completeness, client assistance in the operation of the In-scope Wilshire Products, research and general problem-solving in the operation of the In-scope Wilshire Products. With (ii) immediately below, all issues that arise due to the operation of the In-scope Wilshire Products are the responsibility of ATG client service support, and Wilshire will provide support to Ashland only on a "train the trainer" basis and

1

#070513

scheduled programming and development support as mutually agreed upon.

Notwithstanding collective training as outlined herein, two options exist to be mutually agreed upon prior to entering into an agreement covering Opportunity 2 and 3:

(i) Wilshire provides client service support; or

(ii) ATG provides client service support.

4. <u>License Rights and Restrictions; Acceptance</u>.

(a) **License Rights**.  Specifically related to Opportunity 1 as outlined in Attachment 2, Wilshire grants to Ashland, subject to the terms and conditions contained in this Agreement, a non-exclusive, non-transferable (except as provided herein) license to: (i) install, use, and operate the Wilshire iQComposite, and (ii) copy the Wilshire iQComposite and related documentation to the extent necessary to carry out the foregoing grant.  Wilshire grants Ashland the right to provide access to the Wilshire iQComposite to its customers in connection with providing electronic delivery of the client data to Ashland's hosted services.

(b) **License Rights: Resale and Distribution.** Specifically related to Opportunity 1.2 as outlined in Attachment 2, Wilshire grants to Ashland, subject to the terms and conditions contained in this Agreement, a non-exclusive, non-transferable (except as provided herein) license to: (a) distribute and sell the Wilshire iQComposite to third parties for their internal use, and (b) copy the In-scope Wilshire Products and documentation to the extent necessary to carry out the foregoing grant.

(c) **License Restrictions**.  Ashland acknowledges that the In-scope Wilshire Products and documentation contain information, data and trade secrets that are proprietary to Wilshire.  Ashland shall not, and shall ensure that none of Ashland's customers, take any action, such as decompilation, reverse assembly or reverse engineering, to derive a source code version of the In-scope Wilshire Products or to extract data or trade secrets therefrom.  Neither Ashland nor any of Ashland's customers, may license, distribute or otherwise permit the use of the In-scope Wilshire Products, except as pursuant to and limited by the terms of this Agreement.

(d) **Proprietary Rights.**  Subject to the limited license granted to Ashland by this Agreement, all title to and ownership of the In-scope Wilshire Products and related intellectual property, including all patent, copyright, trademark, trade secret and all other property rights, shall at all times remain with Wilshire.

1

#070513

**(e) Delivery**.  Upon execution of this Agreement, Wilshire shall deliver the In-scope Wilshire Products and applicable documentation to Ashland, and the parties shall commence discussions concerning development of modifications to the In-scope Wilshire Products by Wilshire as mutually agreed by the parties ("Modifications").   The Modifications are described in Attachment 3 hereto and are to be delivered for initial deployment seventy-five (75) days after the Effective Date ("Commencement Date")

**(f) Inspection.**  In the event that the Executive Committee cannot reach an agreement regarding the foregoing acceptance, Wilshire will be granted sixty (60) days to use its commercially reasonable efforts at its own cost to gain the acceptance of the Executive Committee.  This process will be repeated until the Executive Committee accepts the Modification.

## 5. Accounting and Payments

By the fifteenth (15th) day after the end of each calendar quarter (the "Quarter") during the term of this Agreement, the pertinent party hereunder shall provide to the other party an accounting report delineating for each client of the party the client utilization, client commencement date and the amounts earned and due the other party under this Agreement.  The amounts so due shall be remitted no later than thirtieth (30) day following the end of the Quarter.  The client commencement date means the earlier of (i) the start date of the data implementation / conversion process, or (ii) the date of installation of the client onto the In-scope Wilshire Product.

1

#070513

## ATTACHMENT 3 (Proposed Modifications for Initial Deployment)

### Annual Presentation

**AVALON ADVISORS, LP**
**CORE EQUITY COMPOSITE**
**ANNUAL DISCLOSURE PRESENTATION**

| Year End | Total Firm Assets (millions) | Composite Assets | | Annual Performance Results | | | |
| | | U.S. Dollars (millions) | Number of Accounts | Composite | | S&P 500 | Composite Dispersion |
| | | | | Gross | Net | | |
|---|---|---|---|---|---|---|---|
| 2006 | 2,694 | 1,011 | 227 | 10.07% | 8.98% | 15.80% | 0.5% |
| 2005 | 2,184 | 693 | 146 | 14.88% | 13.75% | 4.91% | 1.0% |
| 2004 | 1,370 | 419 | 88 | 15.49% | 14.35% | 10.88% | 0.6% |
| 2003 | 1,032 | 300 | 62 | 28.12% | 26.87% | 28.68% | 1.0% |
| 2002 | 752 | 206 | 54 | (11.47%) | (12.36%) | (22.06%) | 2.0% |
| 2001* | 491 | 109 | 26 | (1.78%) | (2.27%) | (5.61%) | N.A. |

N.A. - Informative is not statistically meaningful due to an insufficient number of portfolios in the composite for the entire year.
*Results shown for the year 2001 represent partial period performance from July 1, 2001 through December 31, 2001.

_Core Equity Composite_ consists of taxable and tax-exempt portfolios invested in the Avalon core equity style. For comparison purposes the composite is measured against the S&P 500 Index. The minimum account size for this composite is $1 million.

Avalon Advisors, LP has prepared and presented this report in compliance with the Global Investment Performance Standards (GIPS®).

Avalon Advisors, LP is an independent investment advisory firm providing asset management advice to wealthy families and institutions. The firm maintains a complete list and description of composites, which is available upon request.

Results are based on fully discretionary accounts under management, including those accounts no longer with the firm. Past performance is not indicative of future results.

The U.S. Dollar is the currency used to express performance. Returns are presented gross and net of management fees and include the reinvestment of all income. Net of fee performance was calculated using actual management fees. The annual composite dispersion is an asset-weighted standard deviation calculated for the accounts in the composite the entire year. Additional information regarding policies for calculating and reporting returns is available upon request.

The management fee schedule is as follows: 1.00% on the first $5 million; 0.75% on the next $15 million; 0.50% on the next $10 million; 0.40% on the next $10 million; and 0.30% over $40 million. Actual investment advisory fees incurred by clients may vary.

Balanced portfolio segments are included in this composite and cash is allocated using separate portfolios to account for segment plus cash returns.

The Core Equity Composite was created in January 2004. Avalon Advisors, LP's compliance with the GIPS standards has been verified for the period July 1, 2001 through December 31, 2006 by Ashland Partners & Company LLP. A copy of the verification report is available upon request.

We have reviewed the above representations of management. The performance results are included as part of a complete disclosure presentation and have not been examined by Ashland Partners & Company LLP. Our opinion is expressed in the Independent Verifier's Report.

_Ashland Partners & Co, LLP_
Ashland Partners & Company LLP

1

#070513

## Quarterly Presentation

**████████████████████████████, L.P.**

**INTERNATIONAL EQUITY COMPOSITE**

**QUARTERLY PERFORMANCE PRESENTATION**

*Asset-Weighted Returns GROSS of Management Fees  (annualized for periods greater than one year)*

| | Quarter | 1 Year | 2 Years | 3 Years | 4 Years | 5 Years | 6 Years | 7 Years | 8 Years | 9 Years | 10 Years |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1Q - 1997 | (3.11%) | | | | | | | | | | |
| 2Q - 1997 | 9.29% | | | | | | | | | | |
| 3Q - 1997 | 0.21% | | | | | | | | | | |
| 4Q - 1997 | (9.30%) | (3.75%) | | | | | | | | | |
| 1Q - 1998 | 12.93% | 12.18% | | | | | | | | | |
| 2Q - 1998 | (0.25%) | 2.39% | | | | | | | | | |
| 3Q - 1998 | (15.62%) | (13.79%) | | | | | | | | | |
| 4Q - 1998 | 17.88% | 12.05% | 3.85% | | | | | | | | |
| 1Q - 1999 | 0.69% | (0.10%) | 5.86% | | | | | | | | |
| 2Q - 1999 | 11.45% | 11.62% | 6.90% | | | | | | | | |
| 3Q - 1999 | 7.78% | 42.57% | 10.87% | | | | | | | | |
| 4Q - 1999 | 25.29% | 51.54% | 30.30% | 17.79% | | | | | | | |
| 1Q - 2000 | (2.81%) | 46.27% | 20.88% | 17.91% | | | | | | | |
| 2Q - 2000 | (2.17%) | 28.40% | 19.71% | 13.63% | | | | | | | |
| 3Q - 2000 | (6.58%) | 11.29% | 25.96% | 11.01% | | | | | | | |
| 4Q - 2000 | (4.22%) | (14.92%) | 13.54% | 13.04% | 8.59% | | | | | | |
| 1Q - 2001 | (13.68%) | (24.64%) | 5.13% | 3.36% | 5.50% | | | | | | |
| 2Q - 2001 | 0.58% | (22.31%) | (0.13%) | 3.64% | 3.33% | | | | | | |
| 3Q - 2001 | (15.69%) | (29.89%) | (11.67%) | 3.62% | (1.04%) | | | | | | |
| 4Q - 2001 | 12.88% | (17.38%) | (16.16%) | 2.13% | 4.52% | 2.81% | | | | | |
| 1Q - 2002 | 1.53% | (2.81%) | (14.31%) | 2.41% | 1.78% | 3.78% | | | | | |
| 2Q - 2002 | (2.14%) | (5.44%) | (14.29%) | (1.93%) | 1.29% | 1.51% | | | | | |
| 3Q - 2002 | (19.51%) | (9.73%) | (20.44%) | (11.03%) | 0.11% | (2.84%) | | | | | |
| 4Q - 2002 | 7.41% | (14.10%) | (15.75%) | (15.48%) | (2.20%) | 0.50% | (0.22%) | | | | |
| 1Q - 2003 | (8.77%) | (22.82%) | (13.39%) | (17.24%) | (4.58%) | (3.70%) | (1.22%) | | | | |
| 2Q - 2003 | 13.92% | (10.15%) | (7.83%) | (12.93%) | (4.05%) | (1.11%) | (0.53%) | | | | |
| 3Q - 2003 | 8.31% | 20.91% | 4.47% | (8.53%) | (3.94%) | 3.96% | 0.76% | | | | |
| 4Q - 2003 | 13.85% | 28.14% | 4.92% | (3.11%) | (6.21%) | 3.24% | 4.66% | 3.41% | | | |
| 1Q - 2004 | 3.28% | 45.22% | 5.87% | 2.89% | (4.75%) | 3.78% | 3.13% | 4.37% | | | |
| 2Q - 2004 | (3.49%) | 23.03% | 5.14% | 1.49% | (5.07%) | 0.84% | 2.56% | 2.53% | | | |
| 3Q - 2004 | (0.31%) | 13.24% | 17.01% | 7.32% | (3.52%) | (0.72%) | 5.45% | 2.46% | | | |
| 4Q - 2004 | 13.56% | 12.95% | 20.31% | 7.53% | 0.68% | (2.68%) | 4.80% | 5.80% | 4.56% | | |
| 1Q - 2005 | 1.95% | 11.39% | 27.19% | 7.68% | 4.95% | (1.72%) | 5.01% | 4.27% | 5.22% | | |
| 2Q - 2005 | 1.48% | 17.12% | 20.04% | 8.99% | 5.19% | (1.00%) | 3.39% | 4.52% | 4.25% | | |
| 3Q - 2005 | 12.13% | 31.74% | 22.14% | 21.73% | 12.96% | 2.68% | 4.07% | 8.86% | 5.73% | | |
| 4Q - 2005 | 4.65% | 21.41% | 17.10% | 20.68% | 10.84% | 4.52% | 0.99% | 7.02% | 7.64% | 6.31% | |
| 1Q - 2006 | 9.09% | 29.91% | 20.29% | 28.09% | 12.85% | 9.53% | 2.96% | 8.25% | 7.17% | 7.72% | |
| 2Q - 2006 | (0.77%) | 27.02% | 21.97% | 22.32% | 13.24% | 9.23% | 3.20% | 6.47% | 7.10% | 6.57% | |
| 3Q - 2006 | 3.79% | 17.58% | 24.46% | 20.60% | 20.68% | 13.87% | 5.03% | 5.90% | 9.91% | 6.98% | |
| 4Q - 2006 | 10.96% | 34.67% | 23.02% | 19.57% | 21.66% | 13.48% | 7.63% | 4.08% | 9.08% | 9.41% | 8.01% |

Past performance is not indicative of future results. The Independent Verifier's Report and the Annual Disclosure Presentation are an integral part of this presentation.

Additional Modifications will be specified, scheduled, and delivered. All proposed Modifications will be built around mutually-agreed upon specifications, including sufficient documentation outlining the Modification with the corresponding timeline. Upon delivery of proposed Modification, the Executive Committee will evaluate the Modification relative to the original specification(s) for acceptance that will not be unreasonably withheld.

1

#070513

Specific areas of future development within 12 months from the Commencement Date may include but are not limited to:

1) Reporting – additional reports specific to Ashland or its clients. Two examples of this enhanced reporting are outlined in this Attachment.
2) Reconciliation – additional functionality in the area of AUM, return, market value reconciliation vs. other datasets.
3) Disclosures and Policy and Procedures "P&P" – enhancements to the capabilities in these areas. Examples: keyword look through for disclosures, i.e. look into the specific composite information benchmark, fees, minimum account size etc.  "Locking down" of specific mandatory P&P items.

1

MAY-18-2007  12:42      WILSHIRE FMG                                3104584103    P.20/23

#070513

## ATTACHMENT 4

**OPPORTUNITY One**

| | first 250 clients | 250 to 500 clients | 500 to 750 clients | 750 or more clients | TOTAL CLIENTS | |
|---|---|---|---|---|---|---|
| Per Client per Year | $ 2,000 | $ 1,750 | $ 1,500 | $ 1,000 | | |
| | Estimated Ashland Verification Aid Client Rollout | | | | | |
| Quantity of Clients | 250 | - | - | - | 250 | |
| Resulting Wilshire Revenue | 500,000 | | | | | $ 500,000 |
| Quantity of Clients | 250 | 250 | | | 500 | |
| Resulting Wilshire Revenue | 500,000 | 437,500 | | | | $ 937,500 |
| Quantity of Clients | 250 | 250 | 250 | | 750 | |
| Resulting Wilshire Revenue | 500,000 | 437,500 | 375,000 | | | $ 1,312,500 |
| Quantity of Clients | 250 | 250 | 250 | 250 | 1,000 | |
| Resulting Wilshire Revenue | 500,000 | 437,500 | 375,000 | 250,000 | | $ 1,562,500 |

---

### Minimum Annual Fees by Ashland to Wilshire

$250,000 for year 2007; $500,000 per each calendar year thereafter, payable on or before January 31 of the subsequent year. If the aggregate Opportunity 1 fees paid to Wilshire for each such year are less than $500,000, then the difference will be paid by Ashland to Wilshire

**Note: For each $1 Million of contractually committed Wilshire revenues derived through Opportunity 2 and/or 3, Wilshire will reduce the verification aid fees due Wilshire under Opportunity 1 by twenty (20) percent, but not below zero.**

**OPPORTUNITY 1.2**
**AUM<$2.5B**

| | first 250 clients | 250 to 500 clients | 500 to 750 clients | 750 to 1,000 clients | 1,000+ clients | Total Installed |
|---|---|---|---|---|---|---|
| Per Client per Year | $ 3,000 | $ 2,000 | $ 1,500 | $ 750 | $ 300 | |
| | Estimated Number of Managers with less than $2.5 B AUM Rollout | | | | | |

2

#070513

| Quantity of Clients | 250 | - | - | - | - | 250 |
|---|---|---|---|---|---|---|
| Resulting Wilshire Revenue | 750,000 | | | | | $750,000 |
| Quantity of Clients | 250 | 250 | | | | 500 |
| Resulting Wilshire Revenue | 750,000 | 500,000 | | | | $1,250,000 |
| Quantity of Clients | 250 | 250 | 250 | | | 750 |
| Resulting Wilshire Revenue | 750,000 | 500,000 | 375,000 | | | $1,625,000 |
| Quantity of Clients | 250 | 250 | 250 | 250 | | 1,000 |
| Resulting Wilshire Revenue | 750,000 | 500,000 | 375,000 | 187,500 | | $1,812,500 |
| Quantity of Clients | 250 | 250 | 250 | 250 | 250 | 1,250 |
| Resulting Wilshire Revenue | 750,000 | 500,000 | 375,000 | 187,500 | 75,000 | $1,887,500 |

**Note: If and when the verification aid fees due Wilshire under Opportunity 1 are discounted to zero as a result of the contractually committed revenues to Wilshire under Opportunity 2 and/or 3, for each additional $1 Million of contractually committed Wilshire revenues derived through Opportunity 2 and/or 3, Wilshire will reduce the fees due Wilshire under Opportunity 1.2 on account of managers with less than $2.5 B AUM by twenty (20) percent, but not below fifty (50) percent.**

| OPPORTUNITY 2 | | THE WILSHIRE iQCOMPOSITE | | Wilshire iQComposite fee | |
|---|---|---|---|---|---|
| FUNCTIONALITY | | | | 1 | 1 |
| PORTFOLIO / AUM | iQ1 | | | 0.5 | 0 |
| | iQ2 | | | 1 | 0 |
| | iQ3 | | | 1.5 | 0 |
| | iQ4 | | | 1.75 | 0 |
| | iQ5 | | | 2.5 | 0 |
| | iQ6 | | | 3.5 | 0 |
| | iQ7 | | | 4.5 | 0 |
| | iQ8 | | | 5.25 | 1 |
| | iQ9 | | | 6 | 0 |
| | iQ10 | | | 7 | 0 |
| | iQ100 | | | 8 | 0 |
| BASIC CAPABILITIES | iQ P 1 | | | | |

2

#070513

| | | |
|---|---|---|
| | iQ P 2 | |
| | iQ P 3 | |
| | | |
| **DATABASE OPTIONS** | iQ D 1<br>iQ D 2<br>iQ D 3<br>iQ D 4<br>iQ D 5 | |
| **CONCURRENT USERS** | iQ UC<br>iQ<br>UW | |
| | | |

## OPPORTUNITY 3 Wilshire Abacus

| | $000/module | # modules |
|---|---|---|
| **Base - Accounting/Perf (only at segment level)** | 10 | 1 |
| **Modules** | | |
| *Accounting Modules* | | |
| Wilshire supplied data files (global to local) | 5 | |
| Auto posting of transactions and accruals (systran) | 5 | 1 |
| Billing Module | 5 | 1 |
| DTC | 5 | |
| *Performance Modules* | | |
| Expanded Performance (sector, industry)+Security Return | 7.5 | 1 |
| Complex Performance (beyond sector,industry)+Variance | 7.5 | 1 |

2

MAY-18-2007  12:42          WILSHIRE FMG                        3104584103      P.23/23

#070513

| | | |
|---|---|---|
| Expanded Index Returns (sector, industry) - Domestic | 5 | |
| Expanded Index Returns (sector, industry) - Global | 5 | |
| *Accounting/Performance Modules* | | |
| Daily Valuations and Performance | 6 | 1 |
| Multiple Pricing Capability | 5 | |
| Multiple Exchange Rate Sourcing Capability | 2.5 | |
| Multi-currency (currency, country) | 15 | 1 |
| **Server Fee** | | **56** |
| **Off-site Shared Installation (50% of server fee)** | 0.5 | 1 |
| **Off-site Separate Installation (80% of server fee)** | 0.8 | |
| **Adjusted Server Fee** | | **84** |

## User/Workstation Configuration

| **Concurrent Users** | $000/user | # users | |
|---|---|---|---|
| # simultaneous users (1st user free) | 4.5 | 5 | 18 |
| # workstations (1st workstation free) | 0.5 | 10 | 4.5 |
| # no-service simultaneous users | 2 | | 0 |
| **User/Workstation Fee** | | | **22.5** |

## Annual Fee:  Server + User/Workstations
**First Year**                                                          **106.5**
**Subsequent Years**                                                **106.5**

## Service Level Agreements

| | | | |
|---|---|---|---|
| **24x7 Availability** | .10 | 1 | 10 |
| **Annual Platinum Service Contract (incl. 24x7)** | 0.3333333 | | 0 |

2

TOTAL P.23

## FIRST AMENDMENT TO THE RELATIONSHIP AGREEMENT

This First Amendment to the Relationship Agreement (the "Agreement") by and between Ashland Partners & Company LLP ("Ashland") and Wilshire Associates Incorporated ("Wilshire") is entered into as of July 24, 2007 with reference to the following:

1.      Section 13.10 of the Agreement provides that Ashland and Wilshire shall use commercially reasonable efforts to negotiate and execute by July 31, 2007 (the "Addendum Due Date") an addendum to the Agreement setting forth mutually acceptable template license, hosting and support agreements to be used in connection with the transactions contemplated by the Agreement.

2.      Section 13.10 provides further that if such an addendum is not executed by the Addendum Due Date, Ashland and Wilshire may, upon good faith negotiation, agree in writing to create an extension of the Addendum Due Date.

3.      As a result of their good faith negotiation, Ashland and Wilshire hereby agree to extend the Addendum Due Date by additional seventy-five (75) days to October 15, 2007.

4.      The Agreement, as amended hereby, shall operate on a continuous basis until terminated as specified therein.  All provisions of the Agreement not inconsistent with this First Amendment shall remain in full force and effect.

        The following signatures signify acceptance of this First Amendment by Wilshire and Ashland.

For Wilshire:                              For Ashland:

Wilshire Associates Incorporated          Ashland Partners & Company LLP


Signature:                                Signature:




Name:                                     Name:  Melvin W. Ashland, CPA/PFS
Title:                                    Title:  Managing Partner/CEO


                                          Signature:




                                          Name:  Tobin S. Cochran
                                          Title:  Partner/President

#071027

## SECOND AMENDMENT TO THE RELATIONSHIP AGREEMENT

This Second Amendment to the Relationship Agreement (the "Agreement") by and between Ashland Partners & Company LLP ("Ashland") and Wilshire Associates Incorporated ("Wilshire") is entered into as of October 11, 2007 with reference to the following:

1.      Section 13.10 of the Agreement provides that Ashland and Wilshire shall use commercially reasonable efforts to negotiate and execute by July 31, 2007 (the "Addendum Due Date") an addendum to the Agreement setting forth mutually acceptable template license, hosting and support agreements to be used in connection with the transactions contemplated by the Agreement.

2.      Section 13.10 provides further that if such an addendum is not executed by the Addendum Due Date, Ashland and Wilshire may, upon good faith negotiation, agree in writing to create an extension of the Addendum Due Date.

3.      First Amendment to the Agreement extended the Addendum Due Date by additional seventy-five (75) days to October 15, 2007.

4.      As a result of their good faith negotiation, Ashland and Wilshire hereby agree to extend the Addendum Due Date by additional seventy-five (75) days to January 1, 2008.

5.      The second sentence under "Objective" under "Opportunity 1 and 1.2" of Attachment 2 of the Agreement reads as follows:

"Additionally, Ashland can market the service associated with the Wilshire iQComposite to clients with less then $2.5 Billion in assets under management (AUM)."

Wilshire and Ashland hereby amend that sentence to read:

"Additionally, Ashland can market the service associated with the Wilshire iQComposite to clients with less then $2.5 Billion in assets under management (AUM) or total number of discretionary portfolios [as defined under GIPS] less then fifty (50)."

6.      The Agreement, as amended hereby, shall operate on a continuous basis until terminated as specified therein. All provisions of the Agreement not inconsistent with this Second Amendment shall remain in full force and effect.

The following signatures signify acceptance of this Second Amendment by Wilshire and Ashland.

For Wilshire:                                       For Ashland:

Wilshire Associates Incorporated                   Ashland Partners & Company LLP

Signature:                                         Signature:

Name:  CECILIA I. LOO                              Name:  Melvin W. Ashland, CPA/PFS
Title:  Managing Director                          Title:  Managing Partner/CEO

                                                   Signature:

                                                   Name:  Tobin S. Cochran
                                                   Title:  Partner/President

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Margaret M. Morrow and the assigned discovery Magistrate Judge is Carla Woehrle.

The case number on all documents filed with the Court should read as follows:

## CV08- 3008 MMM (CWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] **Western Division** | [ ] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

Dreier Stein Kahan Browne Wood George LLP
Stanton L. Stein (No. 131567)
Fred Griffin (No. 66027)
Brooke H. Eisenhart (No. 229299)
1620 26th Street, Sixth Floor, North Tower
Santa Monica, CA 90404
Telephone: (310) 828-9050
Facsimile: (310) 828-9101

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Wilshire Associates Incorporated, a California Corporation<br><br>PLAINTIFF(S)<br><br>V.<br><br>Ashland Partners & Co., LLP, an Oregon Limited Liability Partnership<br><br>DEFENDANT(S). | CASE NUMBER<br><br>**CV08-03008 MMM (CWx)**<br><br><br>**SUMMONS** |

TO:DEFENDANT(S): <u>Ashland Partners & Co., LLP</u>

A lawsuit has been filed against you.

Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☒ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, <u>Stanton L. Stein</u>, whose address is <u>Dreier Stein Kahan Browne Woods George LLP, 1620 26th Street, Sixth Floor, North Tower, Santa Monica, CA 90404</u>. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated:    **MAY - 7** 2008       By: _Natalie Hongoia_
                                           Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

American LegalNet, Inc.<br>www.USCourtForms.com

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| | |
|---|---|
| **I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)<br>Wilshire Associates Incorporated, a California corporation | **DEFENDANTS**<br>Ashland Partners & Co., LLP, an Oregon Limited Liability Partnership |
| **(b)** County of Residence of First Listed Plaintiff (Except in U.S. Plaintiff Cases):<br>Los Angeles, California | County of Residence of First Listed Defendant (In U.S. Plaintiff Cases Only):<br>Jackson County, Oregon |
| **(c)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br>Dreier Stein Kahan Browne Woods George LLP<br>Stanton L. Stein (SBN 131567); Fred Griffin (SBN 66027)<br>1620 26th Street, Sixth Floor, North Tower<br>Santa Monica, CA  90404<br>Tel:  (310) 828-9050  Fax:  (310) 828-9101 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1  U.S. Government Plaintiff  ☐ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant  ☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1  Original Proceeding  ☐ 2  Removed from State Court  ☐ 3  Remanded from Appellate Court  ☐ 4  Reinstated or Reopened  ☐ 5  Transferred from another district (specify):  ☐ 6  Multi District Litigation  ☐ 7  Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☐ Yes ☒ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No   ☒ **MONEY DEMANDED IN COMPLAINT: $** 250,000.00

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Declaratory relief

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities /Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☒ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities – Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | **REAL PROPERTY** | | ☐ 446 American with Disabilities – Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | | | ☐ 690 Other | ☐ 865 RSI(405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**VIII(a). IDENTICAL CASES:** Has this action been previously filed and dismissed, remanded or closed?  ☒ No  ☐ Yes

If yes, list case number(s):

| | |
|---|---|
| **FOR OFFICE USE ONLY:** | Case Number: |

**CV08-03008**

| | | |
|---|---|---|
| CV-71 (07/05) | **CIVIL COVER SHEET** | American LegalNet, Inc.<br>www.USCourtForms.com |

Page 1 of 2

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

III(b). RELATED CASES: Have any cases been previously filed that are related to the present case? ☒ No ☐ Yes

'yes, list case number(s): _____

'ivil cases are deemed related if a previously filed case and the present case:

Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

X. VENUE: List the California County, or State if other than California, in which EACH named plaintiff resides (Use an additional sheet if necessary)
☐ Check here if the U.S. government, its agencies or employees is a named plaintiff.

County of Los Angeles, California

.ist the California County, or State if other than California, in which EACH named defendant resides. (Use an additional sheet if necessary).
☐ Check here if the U.S. government, its agencies or employees is a named defendant.

Oregon

.ist the California County, or State if other than California, in which EACH claim arose. (Use an additional sheet if necessary)
Note: In land condemnation cases, use the location of the tract of land involved.

County of Los Angeles, California

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____    Date May 7, 2008

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

American LegalNet, Inc.
www.USCourtForms.com